# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STEPHANIE FAY TRENT, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. CIV-23-243-SPS** |
| | ) | |
| MARTIN O'MALLEY,[1] | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

The claimant Stephanie Fay Trent requests judicial review pursuant to 42 U.S.C. § 405(g) of the denial of benefits by the Commissioner of the Social Security Administration. She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED to the ALJ for further proceedings.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted for Kilolo Kiakazi as the Defendant in this action.

engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A).  Social security regulations implement a five-step sequential process to evaluate a disability claim.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied.  *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997).  Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  The Court may not reweigh the evidence or substitute its discretion for the Commissioner's.  *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991).  But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  *See also Casias*, 933 F.2d at 800-01.

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities.  If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied.  If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1.  If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry.  Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work.  At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC.  Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work.  *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

**Claimant's Background**

Claimant was born on January 25, 1988, and was 32 years old on the alleged disability onset date. (Tr. 28).  She was 34 years old at the time of the administrative hearing. (Tr. 42). She has completed her GED and has no past relevant work experience.  (Tr. 29, 42).  Claimant alleges she has been unable to work since December 28, 2020. (Tr. 42, 226, 233).

**Procedural History**

Claimant filed applications for Title II disability insurance benefits, and supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85 on February 10, 2021. (Tr. 226, 233). Her applications were denied. ALJ Kim Parrish held an administrative hearing on November 17, 2022 (Tr. 39-60) and determined that Claimant was not disabled in a written decision dated February 16, 2023. (Tr. 12-30).  The Appeals Council denied review, so the ALJ's written opinion became the final decision of the Commissioner for purposes of appeal.

**Decision of the Administrative Law Judge**

In the February 16, 2023, decision, the ALJ acknowledged that all of Claimant's claims, both under Title II and Title XVI, had been consolidated. (Tr. 14). The ALJ made his decision at step five of the sequential evaluation.  At step two, the ALJ found that Claimant had several severe physical and mental impairments, including 2 cervical neck injuries; lumbar spine pain; obesity; depression, and anxiety. (Tr. 17). The ALJ considered Claimant's non-severe impairments and included them when formulating her RFC. *Id.*

Next, the ALJ found that Claimant's impairments did not meet a listing. *Id.* At step four, the ALJ found that Claimant retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) with the following qualifications: no

climbing of ladders; follow detailed and simple instructions but not complex instructions; rotate the neck to the right and no more than an occasional basis. (Tr. 20).  Next, the ALJ proceeded to step five and determined that Claimant was not disabled because there was other work that exists in significant numbers in the national economy that she could perform. (Tr. 29-30).

## Review

Claimant contends that the ALJ erred in his consistency analysis, and that he did not properly consider her residual functional capacity ("RFC").  The relevant medical evidence reflects that Claimant complained of pain—particularly in her neck and arms—and she sought appropriate treatment. She also intermittently complained of pain in her back and knees. In this appeal, she now focuses on issues with her neck, along with complaints of headaches. (Pl. Br. 11-15).

In approximately May 2019, over a year before her alleged onset date, Claimant began complaining of right-sided neck pain. (Tr. 506-11, 514-19, 530-33). Imaging of the spine showed a large disc osteophyte complex causing moderate to severe narrowing of the right lateral recess at the C5-6 level. (Tr. 355). Neurosurgeon, Christopher Barry, M.D., recommended surgery (Tr. 354-55, 681-82, 721-22), and in August 2019, Claimant underwent a C4-5 anterior cervical discectomy and fusion. (Tr. 25-51, 359, 736). Within six weeks, she reported at least an 80 percent improvement of her neck and arm symptoms. (Tr. 678-79).

Throughout the remainder of 2019 and early 2020, Claimant continued to do well, particularly regarding her neck and arm pain. (Tr. 484-85, 675-76). She was released to work in January 2020. (Tr. 677). During a July 2020 neurosurgical appointment with Dustin Tims, PA-C, a physician's assistant with Dr. Barry's office, Claimant reported she was much better than she was prior to surgery, but she mentioned intermittent numbness in her arms and stiffness in her neck. (Tr. 673). A neck x-ray showed good hardware placement, with no complications. (Tr. 392,

673, 773). PA Tims reported Claimant had no activity or lifting restrictions. (Tr. 674). On December 29, 2020, around the time of her alleged onset date, Claimant was in a car accident. (Tr. 418, 1023). She presented to the emergency room that same day with complaints of neck and left arm pain. (Tr. 418-20). Over time, Plaintiff continued to complain of increased neck and arm pain. (Tr. 414, 651).

In April 2021, she returned to her neurosurgeon, Dr. Barry, for evaluation. (Tr. 667-69). Clinically, she had marked decreased motion of her neck, along with a positive Spurling's maneuver (test to check for nerve root pain or compression in the neck), muscle spasms, a positive right-side Hoffman's sign (a neurological reflex test that detects corticospinal tract dysfunction), and hyper-reflexes. (Tr. 668). Images of the cervical spine, including a CT scan and an MRI, showed that the C5-6 level was solidly fused, but there were degenerative changes at the C3-4 and C4-5 level with mass effect on the cord. (Tr. 668). Given the findings on imaging, along with Claimant's complaints, Dr. Barry recommended a second surgery. (Tr. 669). Dr. Barry noted that the surgery was necessary because Claimant had "cervical spondylosis, spinal stenosis, herniated disc, myelopathy, and radiculopathy. She has failed conservative management. The procedure is indicated for relief of symptoms, decompression of the cervical spinal cord and exiting nerve roots, as well as to re-establish proper cervical lordosis and alignment." (Tr. 905). Following the surgery, Dr. Barry referred her to outpatient physical therapy, which she had at Mercy Hospital. (Tr. 943-68).

Approximately one year post surgery, on August 11, 2022, Dr. Barry examined Claimant noting that she had "continue[d] to have neck pain, as well as shoulder pain." (Tr. 978). On physical examination, he noted that she had "severe pain with active and passive range of motion of the left shoulder [,]" and in her cervical spine she had "mild diminished range of motion in

flexion and extension, as well as axial." (Tr. 978). He diagnosed her with "1. Cervical spondylosis.

2. Cervical degenerative disc disease, status post C3 to C5 ACDF." (Tr. 979). Dr. Barry noted that

he planned to "obtain a CT [computerized tomography] scan of the cervical spine to ensure she

d[id] not have any evidence of nonunion." (Tr. 979). On October 26, 2022, an addendum was

added to the August 11, 2022, treatment note that stated the following:

> ADDENDUM: 10/26/22--CT scan of Cspine shows evidence of **pseudoarthrosis** C4- C5, with a line of lucency through the disc space. Solid fusion at C3-C4. Patient needs new MRI without gad of Cspine and new dynamic Cspine x-rays and then back in to discuss findings with Dr. Barry. - DWT.

(Tr. 979) (emphasis added).[3]

Kent Denson, M.D. ("Dr. Denson"), and Joshua Priddle, M.D. ("Dr. Priddle"), both of

whom practiced at The Clinic, treated Claimant from December 17, 2022, to the day of the hearing.

(Tr. 50). Claimant testified that she received counseling once a month at The Clinic. (Tr. 50-51).

Dr. Denson and Dr. Priddle assessed and treated Claimant for the following: migraine without aura

and without status migrainosus, not intractable, for which he prescribed Topirimate, the generic

form of Topamax (Tr. 991); Type 2 diabetes mellitus without complication, without long-term

current use of insulin (Tr. 991, 993, 996); other chronic pain (Tr. 991, 999, 1002, 1006, 1044);

right knee pain (Tr. 991, 999, 1002, 1006, 1044); left knee pain (Tr. 991, 1002); low back pain,

unspecified and lumbago with sciatica, left and right side (Tr. 991, 1002, 1005-6, 1018, 1031,

1044); pain in right shoulder (Tr. 1002); pain in left shoulder (Tr. 1002); generalized anxiety

---

[3] "Pseudarthrosis is the result of failed attempted spinal fusion. This condition typically manifests with axial or radicular pain months to years after the index operation. . . . Treatment of the patient with symptomatic pseudarthrosis involves a second attempt at fusion and may require an approach different from that of the index surgery as well as the use of additional instrumentation, bone graft, and osteobiologic agents. See https://pubmed.ncbi.nlm.nih.gov/19652031/ (Last visited October 2, 2023)." (Pl. Br. At 9).

disorder ("GAD") (Tr. 999, 1018, 1031); depression (Tr. 999, 1017, 1030); cervicalgia (Tr. 1005, 1007, 1009, 1011, 1036, 1038, 1040, 1043); cervical radiculopathy (Tr. 2005, 1043); left arm numbness. (Tr. 1007, 1040). On physical examination, Dr. Denson found the following: limited range of motion in the left shoulder (Tr. 998); crepitus in the right knee. (Tr. 998). On examination, Dr. Priddle found the following: Claimant was nervous and anxious and referred her to in-house counseling (Tr. 1003, 1005, 1043); tenderness and increased tonicity in Claimant's neck at C2/C3, also C6/C7 mostly on the left (Tr. 1014, 1033); restricted range of motion and tenderness in her neck. (Tr. 1011, 1035).

Denise LaGrand, Psy.D. ("Dr. LaGrand"), Licensed Clinical Psychologist, performed a consultative psychological examination on Claimant at the request of the State agency on July 28, 2021. (Tr. 700-5). Dr. LaGrand's diagnostic impression was that Claimant had an adjustment disorder. (Tr. 703). She opined that Claimant had moderate limitations on her ability to function in the following areas: Understanding and Memory Sustained concentration and persistence; Performing detailed/complex tasks; Performing work activities consistently; Working without special/additional instruction. (Tr. 704). She also stated that Claimant showed "no overt evidence of symptom magnification." (Tr. 704).

On February 9, 2022, Henry Evbuomwan MS, Licensed Professional Counselor, performed a virtual consultative psychological examination on Claimant at the request of the State agency. (Tr. 970-5). Mr. Evbuomwan diagnosed Claimant with the following: pain in joints, multiple sites; depression, moderate recurrent; rule out with depression with psychotic features. (Tr. 975).

Claimant contends, *inter alia,* that the ALJ erred in his consistency analysis, and that he did not properly consider her residual functional capacity ("RFC"). Specifically, she asserts the

ALJ did not appropriately address the issue of her disabling impairments in a manner sufficient to comply with *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987). *See also* Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (effective Mar. 28, 2016). Pursuant to 16-3p, the SSA views and analyzes a claimant's testimony in relation to its consistency with the medical evidence. The Commissioner analyzes a claimant's testimony using factors identified in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). SSR 16-3p is consistent with the court's analysis in *Luna*. *See Paulek v. Colvin*, 662 F.App'x 588, 593-4, 2016 WL 5723860 * 4 (10th Cir. October 3, 2016) (unpublished op.) ("The ALJ thus considered the degree to which Mr. Paulek's subjective claims were consistent with the medical evidence, see SSR 16-3p, 2016 WL 1119029 at *5-6, which comports with *Luna*.").

> Within this analysis, the ALJ should consider factors such as "a claimant's persistent attempts to find [pain relief] and [her] willingness to try any treatment prescribed, regular use of crutches or a cane, regular contact with a doctor . . . and the claimant's daily activities, and the dosage, effectiveness, and side effects of medication." *Id.* At 1167 (internal quotation marks omitted); *see also* SSR 16-3P, 2016 WL 1119029, at *7 (Mar. 16, 2016) (listing similar factors to consider in evaluating intensity, persistence, and limiting effects of a claimant's symptoms). The ALJ need not consider these factors in a formalistic way, but the substance must be there. *See Keyes-Zachary*, 695 F.3d at 1167.
> . . .
> Our approach is consistent with SSR 16-3P, which emphasizes the insufficiency of conclusory statements and recitations of factors and instructs how the "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3P, 2016 WL 1119029, at *9.

*Brownrigg v. Berryhill*, 668 F.App'x 542, 545-6 (10th Cir. April 19, 2017). In assessing allegations of pain, an ALJ "must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven

impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166-67 (10th Cir. 2012) (citing *Luna*, 834 F.2d at 163-64).

In the instant case, Claimant's testimony and the Function Report-Adult form she completed, reflected the following: she had severe, constant neck pain that radiated to her head causing daily migraines and down her arms (Tr. 44-5); she took Topamax for her migraines (Tr. 45); her arm pain was constant with her left being a little worse than her right (Tr. 46); she had constant numbness in her neck, shoulders and arms into her hands mostly on the left arm (Tr. 46, 296-7); the numbness in her left hand limited her ability to grasp and handle (AR. 46-7, 277, 296); she did not take any pain medication because she was waiting for her surgeon to refer her to pain management (Tr. 47); she had constant pain in her low back that radiated down both legs to her feet (Tr. 48); she had daily numbness her hips and the top part of her legs (Tr. 48); she had a steroid injection in her back that did not help the pain (Tr. 48); she had daily muscle spasms in her shoulders, arms, back and legs (Tr. 49); she had bilateral knee pain and swelling depending on her level of activity (Tr. 49-50); she saw a counselor once a month for depression and anxiety (Tr. 50-1); she had difficulty concentrating and staying focused (Tr. 51), and she had difficulty going asleep and staying asleep because of pain. (Tr. 51-2, 278, 297).

Claimant testified her daily activities included mostly microwave meals or frozen dinners, and when she did cook, her son had to help her (Tr. 53, 279, 298); her kids had to help her with the housework (Tr. 54, 278-9, 298); she spent at least half the day either reclining or lying down due to pain (Tr. 54, 277, 296); she was limited in her ability to lift, sit, stand, walk, lift, reach, squat, kneel, climb stairs, bend, use her hands, complete tasks, concentrate, remember, handle stress and handle changes in routine (Tr. 277, 282-3, 296, 301-2); she used a motorized cart when

shopping, and her son helped with the shopping (Tr.54, 280); her kids helped her dress, and she

used a shower chair. (Tr. 54-5, 278, 297).

In contrast, however, the ALJ characterized Claimant's activities of daily living in the

following manner:

> The claimant notes she can stand about 20 to 30 minutes but later
> reported she can stand for 30 minutes to an hour, and she wrote she
> cannot sit or stand for long periods at a time, described as an hour.
> The claimant reports limited activities of daily living. The claimant
> writes that she could do light cleaning, take care of her children,
> prepare simple foods, manage her finances, shop with help for lifting
> and use of a motorized cart, and drive. She goes out alone, watches
> her children's activities, and talks with others at home, at a
> neighbor's house, and at a park. The objective evidence in the record
> indicates the claimant has appropriate grooming and hygiene.
> Moreover, the claimant reported being able to make and keep
> appointments independently. The evidence of record discussed
> herein documents the claimant's adequate functioning to work above
> the level of substantial gainful activity. The claimant's allegations
> concerning her subjective complaints that comport with the medical
> evidence indicate she cannot perform work-related activities
> excluded by her established residual functional capacity.

(Tr. 26).

Claimant asserts, and the Court agrees, the ALJ's description of her activities is not an

accurate characterization of her activities as noted above. The Court finds "an ALJ cannot use

mischaracterizations of a claimant's activities to discredit his claims of disabling limitations."

*Sitsler v. Astrue*, 410 F.App'x 112, 117 (10th Cir. 2011); *Talbot v. Heckler*, 814 F.2d 1456, 1462,

1464 (10th Cir. 1987) (noting that the ALJ improperly based his conclusion that claimant could do

light work on a mischaracterization of his activities). Claimant contends her testimony and the

forms that she completed reflect that she has structured her life to avoid exacerbations of her

condition. Finally, although daily activities are one factor when determining consistency, that

factor alone would not support the ALJ's finding that Claimant's subjective complaints were not

consistent with the medical evidence. *See Krauser v. Astrue*, 638 F.3d 1324, 1332-1333 (10th Cir. 2011) (discussing necessity of looking at claimant's actual activities and stating that "sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity") (internal quotation marks omitted). Therefore, the medical evidence supports a finding of at least a "'loose nexus' between [her] proven impairments and [her] subjective allegations. . . . " *See Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987).

Additionally, Claimant argues the ALJ failed to consider a primary consideration identified in *Keyes-Zachary* and SSR 16-3p. Namely, except for the mental consultative examination, almost the entire medical evidence of record consists of Claimant's attempts to seek treatment for relief from her impairments, which included two surgical fusions with the possibility of a third because of the pseudoarthrosis, a lumbar epidural steroid injection, and a significant amount of physical therapy. Significantly, no treating or examining provider ever questioned her veracity concerning her impairments or symptoms she related to her impairments.

Finally, the ALJ next notes that Mr. Tims' stated that Claimant "September 2021 x-rays showed good hardware and graft placement with no complications and a *solid fusion at C5-C6*." (Tr. 27) (emphasis added). The ALJ used this statement by Mr. Tims to find the State agency medical consultants' findings persuasive by stating that their "opinions are consistent with examination findings and imaging, including that submitted at the hearing level that show a *solid cervical surgical fusion*." (Tr. 26). The problem with the ALJ's analysis, as noted by Claimant, is that it is only partially correct. (Pl. Br. At 12). Dr. Barry's first surgery on Claimant's neck on August 13, 2019, was a C5-C6 fusion. (Tr. 359-60, 736-8). However, the second surgery on August 10, 2021, involved a removal of the C5-C6 hardware and a two-level fusion at C3-C4 and C4-C5. (Tr. 668-9, 904-6). Therefore, while Claimant does not dispute that the objective x-ray evidence

showed a solid fusion at C5-C6, the focus of Dr. Barry's first surgery, Claimant asserts that no

evidence shows that the fusion at C4-C5 ever solidified. To the contrary, based on the October 26,

2022, addendum to Dr. Barry's August 11, 2022, treatment note that stated that the CT scan

showed "evidence of pseudoarthrosis C4-C5, with a line of lucency through the disc space,"

although the CT scan did show a solid fusion at C3-C4. (Tr. 979). At least at C4-C5, the evidence

suggests Claimant did not achieve a solid fusion. Because Mr. Tims described the CT results as

pseudoarthrosis, "he was describing a *"failed attempted spinal fusion." See*

https://pubmed.ncbi.nlm.nih.gov/19652031/ (Last visited October 2, 2023)." (Pl. Br. at 13).

Thus, although the ALJ was correct in noting that Claimant had a solid fusion at C5-C6,

he failed to recognize that, one year after her second neck surgery, Claimant *did not* have a solid

fusion at C4-C5. Moreover, the ALJ never discussed or even acknowledged the October 26, 2022,

addendum indicating that, at least partially, Claimant's second fusion had failed. This oversight

undermines the ALJ's analysis of the evidence. Furthermore, Claimant's testimony at the hearing

and her statements in her function forms are consistent with Mr. Tims' subsequent treatment of

Claimant after the September 8, 2021, for continued left arm and neck pain and the October 26,

2022, addendum.

Accordingly, the Court finds the ALJ did not perform a proper consistency analysis as

required under SSR 16-3p or *Luna*. Because the ALJ erred in his consistency analysis, the ALJ's

assessment of her RFC is also incorrect. "Since the purpose of the credibility evaluation is to help

the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently

intertwined." *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009).

**Conclusion**

In summary, the Court finds the correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. Accordingly, the decision of the Commissioner is hereby REVERSED, and the case is REMANDED. On remand, the ALJ shall evaluate Claimant's allegations of pain and limitation in accordance with the proper legal standards, and in particular, shall make specific evidentiary findings with respect to Claimant's subjective complaints of disabling back pain, taking into account Claimant's consistent attempts to obtain medical treatment.

**IT IS SO ORDERD this 8th day of May, 2024.**

_____

**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**